UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

TIMOTHY SAID CHAMBLISS,

          **Plaintiff,**

v.                                     **Case No: 6:22-cv-44-PGB-RMN**

BREVARD COUNTY SHERIFF'S
OFFICE, WAYNE IVEY and
TYLER HARRELL,

          **Defendants.**

_____/

## ORDER

     This cause comes before the Court on Defendants Wayne Ivey and Tyler Harrell's (collectively, the "**Defendants**") Amended Motion for Summary Judgment. (Doc. 59 (the "**Motion**")). Plaintiff Timothy Chambliss ("**Chambliss**") responded in opposition (Doc. 60), and Defendants subsequently replied (Doc. 64). Upon consideration, Defendants' Motion is due to be granted in part and denied in part.

## I.    BACKGROUND

     The following lawsuit concerns whether Brevard County Sheriff's Deputy Tyler Harrell ("**Deputy Harrell**") used excessive force while arresting Chambliss. (Doc. 16). During a search, Chambliss "wiggl[ed]" away from Deputy Harrell's

hand, who then took him to the ground. (Doc. 46, 45:4–20).[1] Less than a second later, a video depicts Deputy Harrell delivering a single blow to the back of Chambliss's head with his prosthetic arm. (Docs. 51, 55).[2]

The scene: South Cocoa, March 20, 2019, shortly before 4 p.m. (Doc. 46, p. 142). Deputy Harrell was patrolling Peachtree Street in the area near Prospect Park when a man, Chambliss, caught his eye. (*Id.*). Morning shift had taken a stolen vehicle report on the northwest side of town. (*Id.* at p. 303). They found the car parked in front of the corner store where Peachtree Street crosses Fiske Boulevard. (*Id.* at p. 142).[3] Store surveillance video captured a blurry glimpse of the suspect: a thin, middle-aged black man, roughly 5'7" tall with protruding front teeth, who frequents the convenience store one block east witnesses said. (*Id.*; Doc. 47, p. 9:10–11; Doc. 58, ¶ 5). Deputy Harrell had been roving the area hoping to arrest the guy. (Doc. 46, p. 142; Doc. 47, p. 9:18–19).

The neighborhood was no stranger to crime. (Doc. 47, 31:21–24). The convenience store where the suspect allegedly spent his time, known to Chambliss

---

[1]   Unless otherwise noted, the facts as presented here generally represent Chambliss's version of events when the two parties differ. *See Scott v. Harris*, 550 U.S. 372, 378 (2007) (highlighting that courts generally adopt the plaintiff's version of the facts in a qualified immunity case).

[2]   Deputy Harrell wears a prosthetic limb made of aluminum, rubber, and carbon fiber on his right arm below the elbow. (Doc. 47, 18:7–17). He weighs about 220 pounds. (*Id.* at 18:21).

[3]   The victim had invited a man, "Mike," into her home. (Doc. 46, p. 303). He said he could fix her garage lights. (*Id.*). Instead, he took her keys. (*Id.*). When the deputy found the car, a man named Octavious James was sitting in the passenger seat with an open bottle of cheap booze in hand. (*Id.* at p. 308). However, the victim said he was not "Mike." (*Id.*). Even so, arresting Octavious James "cleared" the stolen vehicle case, according to the investigation report. (*Id.* 56:4–6, p. 309).

as "Bald Head," had a history with drug activity and shootings. (*Id.*; Doc. 46, 66:25–67:13). Deputy Harrell knew as much. (Doc. 47, 31:21–24). Ten years on the beat, stores like Bald Head were a regular stop on his watch. (*Id.* 1:11–22, 32:2–19). People hanging around out front would often scatter when his marked squad car rolled up. (*Id.* 32:11–16).

Chambliss stood amid a group of ten or so people outside the convenience store when Deputy Harrell spotted him. (Doc. 46, 36:9–11, p. 142). The 5'10" man was wearing a gray hoodie and jeans. (*Id.* at pp. 137, 142). Gold slugs capped his front teeth. (*Id.* at 49:5–23). He looks like the suspect, the deputy thought. (Doc. 47, 7:19). Deputy Harrell wanted to identify him for a photo lineup. (Doc. 46, p. 142). He started backing into a parking spot out front. (*Id.* at 32:3–23).

Chambliss was already preparing to leave the store when he saw Deputy Harrell pull into the parking lot. (*Id.* 33:10–13; Doc. 58, ¶ 7). He did not have a valid driver's license. (Doc. 58, ¶ 7). His car was parked out front. (*Id.*). Getting behind the wheel in front of the deputy was not a good idea, he surmised. (Doc. 46, 32:3–24). The small amount of marijuana in his front pocket would not help, either. (*Id.* 37:17–18, 47:25–48:6). He headed away from the store on foot toward Prospect Park. (Doc. 58, ¶ 7).

Dressed in uniform, Deputy Harrell got out of his patrol car and followed quickly behind. (*Id.* ¶ 9). He tried to get his attention, but Chambliss ignored him. (Doc. 46, 34:8–14). Chambliss made it about a block from the store before he finally turned around and acknowledged him. (*Id.* 33:15–16, 40:1–23).

"What's your name?" Deputy Harrell asked. (*Id.* 36:12–15). Chambliss gave it to him along with his date of birth. (*Id.*). Deputy Harrell said he was lying. (*Id.*). He asked to see his identification. (*Id.* 36:19–20). Chambliss did not have any on him, he said. (*Id.* 37:7–8). Deputy Harrell asked him to walk back to his patrol car so he could run his name. (*Id.* 39:12–13). He obliged. (*Id.*).

Once the two reached the squad car, Deputy Harrell said he smelled marijuana. (*Id.* 44:19–22). Chambliss was not surprised. (*Id.* 67:8–10). Frequent drug activity often made the storefront smell like marijuana. (*Id.*). What did you drop on the ground? Deputy Harrell asked. (*Id.* 44:19–20). Nothing, Chambliss said, confused. (*See id.* 44:20–22).[4] Deputy Harrell commanded Chambliss to turn around and place his hands on the vehicle, preparing to search him. (*Id.* 43:13–15).[5] Chambliss complied. (Doc. 47, 14:15–18). The deputy started at the top with Chambliss's arms and worked his way down. (*Id.*). But Chambliss "wiggl[ed]" away from the deputy's hand once he reached into his pockets. (Doc. 46, 45:4–20).

Chambliss claims Deputy Harrell then slung him to the ground without warning. (*Id.* 47:8–18). Deputy Harrell, on the other hand, contends Chambliss first tried to flee and then fight him, ignoring commands to stop resisting. (*Id.* at p. 142).[6] Regardless, Deputy Harrell got behind Chambliss in a stance where he

---

[4]   In his deposition, Deputy Harrell said Chambliss tossed drugs during a struggle later in the encounter. (Doc. 47, 34:22–35:19).

[5]   Deputy Harrell claims to have informed Chambliss that he had probable cause to search him. (Doc. 47, 14:7–13). Chambliss disagrees. (Doc. 46, 43:13–15).

[6]   According to Deputy Harrell, Chambliss pushed off the patrol car and tried to run away, but the deputy grabbed the back of his hoodie. (Doc. 46, p. 142; Doc. 47, 14:15–23). Chambliss

had "control." (Doc. 47, 16:13–19). A bystander recorded the next twenty-six seconds of their encounter with a cellphone. (Docs. 51, 55).

The first shot shows Deputy Harrell crouched behind Chambliss, leaning up against the rear of a white sedan parked one space away from the deputy's patrol car. The camera zooms in. Deputy Harrell has Chambliss in a hold from behind, with his right arm bent around Chambliss's neck and his left hand pulling his prosthetic limb in tighter. He leans forward against his back. The two men fall to the ground—Chambliss face-first onto the concrete with Deputy Harrell on his



then turned around, catching Deputy Harrell's left arm under his armpit, and took a fighting stance, fists clenched ready to strike, he said. (Doc. 46, pp. 142–43; Doc. 47, 15:8–19). Deputy Harrell "closed the distance," he said, to "get dominance" all while shouting "do not fight me" and "give me your hands" several times. (Doc. 46, p. 143; Doc. 47, 15:8–19, 16:14–19).

back straddling him. Three-tenths of a second later, Deputy Harrell pulls his right arm back and swings his prosthetic limb against the back of Chambliss's head.

After the blow, Chambliss remains prone on the ground with his hands crossed on the back of his head. Deputy Harrell adjusts the hand portion of his prosthetic limb, leans forward, and then clasps his radio. "I didn't hit nobody," Chambliss says. "Put your hands behind your back and stay down!" Deputy Harrell commands. Chambliss immediately complies and cannot be heard saying anything else. Deputy Harrell, still straddled across his back, starts putting him in handcuffs. The video ends there.[7]

Deputy Harrell searched Chambliss incident to arrest but did not find anything on him. (Doc. 47, 34:11–17). He confiscated about 1.5 grams of marijuana from elsewhere at the scene. (*Id.*; Doc. 46, p. 147). Chambliss complained that his teeth hurt and that his blood-glucose level was high. (Doc. 58, ¶ 25). The Cocoa Fire Department responded and assessed Chambliss, determining he needed no further medical attention. (*Id.*). Deputy Harrell then placed Chambliss into his patrol car and booked him in the Brevard County Jail. (*Id.*; Doc. 46, p. 137). Chambliss later agreed to plead no contest to misdemeanor charges of marijuana possession and resisting arrest without violence. Plea Agreement & Judgment,

---

[7] When a court is presented with a videotape at summary judgment, absent any allegation or indication of alteration or distortion of the depicted events, the court should "view[] the facts in the light depicted by the videotape." *Scott*, 550 U.S. at 381.

Docket Nos. 43–45, *State v. Chambliss*, Case No. 05-2019-CF-020931 (Fla. 18th Cir. Ct. Dec. 20, 2019).[8]

Chambliss filed this civil rights complaint under 42 U.S.C. § 1983 alleging excessive force (Counts I, III, IV) against Deputy Harrell and Brevard County Sheriff Wayne Ivey ("**Sheriff Ivey**") in his official capacity. (Doc. 16, ¶¶ 35–48, 57–72). Additionally, Chambliss brings two state-law claims—a battery action against Deputy Harrell (Count II) and a negligent retention action against Sheriff Ivey (Count V). (*Id.* ¶¶ 49–56, 73–79). Sheriff Ivey, in his official capacity, answered Chambliss's complaint with a counterclaim under Fla. Stat. § 960.239 for $9,950 in incarceration costs for time in the Brevard County Jail. (Doc. 22, pp. 10–11).

Defendants now seek summary judgment as to all claims on the basis of qualified immunity, statutory immunity under Fla. Stat. § 768.28(9)(a), and the factual record before the Court. (Doc. 59). Sheriff Ivey further moves for summary judgment on his counterclaim arguing the facts are not in dispute. (*Id.*). Chambliss responded in opposition (Doc. 60), and Defendants then replied (Doc. 64). Accordingly, the matter is now ripe for review.

## II.    STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment

---

[8]    A district court may take judicial notice of public records, such as a document filed in another court. *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1278 (11th Cir. 1999).

as a matter of law." FED. R. CIV. P. 56(a). The party moving for summary judgment must "cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions, interrogatory answers, or other materials" to support its position that it is entitled to summary judgment. FED. R. CIV. P. 56(c)(1)(A). "The court need consider only the cited materials." FED. R. CIV. P. 56(c)(3).

A genuine dispute of material fact is one from which "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). However, "[a] mere scintilla of evidence in support of the non-movant is insufficient to defeat a motion for summary judgment." *Kesinger ex rel. Estate of Kesinger v. Herrington*, 381 F.3d 1243, 1249–50 (11th Cir. 2004) (citing *Anderson*, 477 U.S. at 247). To defeat a motion for summary judgment, the non-moving party must "go beyond the pleadings, and present affirmative evidence to show that a genuine issue of material fact exists." *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006). The Court must draw all reasonable inferences in favor of the non-moving party, but may disregard assertions that are "blatantly contradicted" by record evidence, such as videotape. *See Scott*, 550 U.S. at 380.

## III.  ANALYSIS

Section 1983 provides the procedural mechanism for vindicating constitutionally protected rights violated by persons who act under color of state law. *Laster v. City of Tampa Police Dep't*, 575 F. App'x 869, 872 (11th Cir. 2014) (per curiam). Included within the Fourth Amendment's protection against

unreasonable searches and seizures is the guarantee that all individuals shall be free from the use of excessive force by law enforcement during the course of an arrest. *Fils v. City of Aventura*, 647 F.3d 1272, 1287 (11th Cir. 2011). As such, a sheriff's deputy violates the Fourth Amendment and will be liable under § 1983 when he inflicts unreasonable injury while attempting to effect a suspect's arrest. *See id.* A municipality such as the Brevard County Sheriff's Office can also be liable for the unconstitutional actions of its deputies, but only where the municipality is "found to have itself caused the constitutional violation at issue[.]" *Skop v. City of Atlanta*, 485 F.3d 1130, 1145 (11th Cir. 2007) (noting "it cannot be found liable on a vicarious liability theory"). Accordingly, the Court will first examine the issue of whether a constitutional violation occurred.

### A.   Count I - Fourth Amendment Excessive Force Claim

Chambliss only places the blow to his head at issue. Excessive force claims in the context of an arrest are analyzed under the Fourth Amendment's "objective reasonableness" standard, which balances the severity of the force used against the need for the use of force. *Graham v. Connor*, 490 U.S. 386, 396–97 (1989). Deputy Harrell asserts the blow constituted a reasonable use of force in the face of resistance and that in any event, he should be afforded qualified immunity. (Doc. 59, pp. 17–20). Qualified immunity shields government officials from suits for damages arising from their discretionary authority unless a plaintiff demonstrates (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the alleged conduct such that the defendant

had fair notice that their conduct was actionable. *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011); *Crocker v. Beatty*, 995 F.3d 1232, 1240 (11th Cir. 2021).[9]

Force used by a sheriff's deputy in effecting an arrest complies with the Fourth Amendment when an objectively reasonable deputy confronted with the same circumstances would find that the force used is not excessive. *Graham*, 490 U.S. at 397. Importantly, it "must be judged on a case-by-case basis from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1559 (11th Cir. 1993) (subsequent history omitted); *Vaughan v. Cox*, 343 F.3d 1323, 1331 (11th Cir. 2003) ("We are loath to second-guess the decisions made by police officers in the field."). In measuring whether the use of force was reasonable, a court must consider myriad factors, including (1) the need for the force, (2) the proportionality of the force used in relation to its need, (3) the extent of the injury inflicted on the arrestee, and (4) whether the force was applied maliciously or sadistically. *See Hadley v. Gutierrez*, 526 F.3d 1324, 1329 (11th Cir. 2008); *Vinyard v. Wilson*, 311 F.3d 1340, 1347 (11th Cir. 2002). Courts evaluate "the severity of the crime at issue, whether the suspect posed an immediate threat, and whether the suspect actively resisted arrest" as part of the consideration. *Graham*, 490 U.S. at 396.

---

[9]   The parties do not dispute that Deputy Harrell acted within his discretionary authority. Courts "have discretion to decide which of the two prongs of the qualified[] immunity analysis to tackle first," and the government officials are "entitled to qualified immunity if the plaintiff fails to establish either one." *al-Kidd*, 563 U.S. at 735; *Jacoby v. Baldwin County*, 835 F.3d 1338, 1343–44 (11th Cir. 2016). The Court here will first address whether Deputy Harrell violated Chambliss's Fourth Amendment right to be free from excessive force before turning to whether Chambliss's rights were clearly established at the time of the events in question.

The Supreme Court has long recognized that "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Id.* The Eleventh Circuit has similarly embraced the notion that "some use of force by a police officer when making a custodial arrest is necessary and altogether lawful, regardless of the severity of the offense." *Durruthy v. Pastor*, 351 F.3d 1080, 1094 (11th Cir. 2003). Likewise, de minimis force is not actionable under § 1983. *See Vinyard*, 311 F.3d at 1348 n.13. Those principles notwithstanding, the Eleventh Circuit has made clear that deputies may not use substantial force to apprehend a nonthreatening suspect who has committed only a minor offense and is not resisting arrest. *Johnson v. White*, 725 F. App'x 868, 876 (11th Cir. 2018); *Fils*, 647 F.3d at 1292; *Hadley*, 526 F.3d at 1330 ("Our cases hold that gratuitous use of force when a criminal suspect is not resisting arrest constitutes excessive force.").

Turning to the factors, Deputy Harrell detained Chambliss for marijuana possession, a minor misdemeanor. (Doc. 47, 33:20−24). The arrest occurred in broad daylight in a parking lot in a high-crime area. (*Id.* 31:21−24; Doc. 46, p. 142). Though Chambliss ignored Deputy Harrell's initial calls to get his attention, he did not run from the deputy and eventually acknowledged him. (Doc. 46, 34:8−14). By all accounts, Chambliss had been cooperative and compliant up until the deputy started to reach into his pockets. After that, Chambliss contends he "wiggl[ed]" or "squirmed" away from the deputy's hand resulting in Deputy Harrell taking him to the ground and striking the back of his head with his prosthetic arm, whereas

Deputy Harrell claims Chambliss tried to flee and then turned to fight him first, ignoring multiple verbal commands and reaching for his waistline from which, the deputy worried, he might be trying to retrieve a weapon.

With Plaintiff's best case in hand, an objectively reasonable deputy would not find Chambliss's actions rose to a consequential level of resistance or posed an immediate threat sufficient to justify delivering a blow to the back of his head. According to Chambliss's version of events, his "wiggling" did not interfere with Deputy Harrell's control over his person. The deputy was able to send him to the ground right after. (*Id.* 47:8–20; Doc. 55). Before Chambliss "wiggl[ed]," Deputy Harrell had not informed him that the search was not a consensual ordeal. (Doc. 46, 43:8–15, 45:8–13). Chambliss had cooperated and made no threatening moves toward the deputy. He was not struggling with Deputy Harrell as he was brought to the ground. (*Id.* 56:1–12). In effect, there was no issue of compliance that an objectively reasonable deputy would believe called for a blow to the back of the head to resolve. *Baltimore v. City of Albany*, 183 F. App'x 891, 898 (11th Cir. 2006) (finding a single violent blow to the head of a minor-crime suspect with a flashlight was excessive even though he had shown resistance).[10] After delivering the blow, Deputy Harrell did not hasten to secure Chambliss's hands or seem concerned that

---

[10] Though *Baltimore* is an unpublished opinion and therefore not binding, this Court finds its analysis of markedly similar facts, weighing the need for force against the amount used, to be persuasive. *See McNamara v. Gov't Emps. Ins. Co.*, 30 F.4th 1055, 1061 (11th Cir. 2022) (admonishing a district court for citing an unpublished opinion as the basis for its decision "without separately determining that it is persuasive"). Specifically, the *Baltimore* court deemed a blow to the head with a blunt instrument poses a "substantial risk of serious bodily injury" that qualifies as deadly force, which was excessive to use against a suspect of an open-container violation even when he had shown nonviolent resistance. 183 F. App'x at 898.

he would continue to show resistance. (Doc. 55). Viewed in the light most favorable to the plaintiff, these facts establish Chambliss as a nonthreatening suspect of a minor offense who was not resisting arrest when Deputy Harrell struck him.

Even still, Defendants contend that a single blow to the back of the head constitutes de minimis force. (Doc. 59, pp.17–19). In the Eleventh Circuit, force is de minimis when the actual amount of force used, even if unnecessary, and the injuries sustained are both minor—like skin abrasions from too-tight handcuffs or treatment for knee pain after a kick between the legs. *Jones v. City of Dothan*, 121 F.3d 1456, 1460–61 (11th Cir. 1997); *Gold v. City of Miami*, 121 F.3d 1442, 1446–47 (11th Cir. 1997); *see also Nolin v. Isbell*, 207 F.3d 1253, 1258 (11th Cir. 2000) (finding that getting kneed in the back was de minimis). Here, Chambliss claims the blow to the back of his head loosened some of his teeth, which later fell out, and he suffered headaches following the encounter. (Doc. 46, 49:5–50:19, 63:7–15; Doc. 58, ¶ 27). A single blow to the back of the head hard enough to loosen teeth—delivered with a prosthetic made of metal—constitutes a substantial amount of force, particularly when the suspect is not resisting. *See Baltimore*, 183 F. App'x at 898 (a single blow to a suspect's head with a blunt instrument was excessive); *Hadley*, 526 F.3d at 1330 (a single blow to the stomach was excessive where the suspect "was not struggling or resisting"); *Vinyard*, 311 F.3d at 1347–48 (pepper-spraying a handcuffed suspect's eyes was excessive). Defendants'

argument is not well-taken.

Admittedly, "wiggling" or "squirming" during a search would call for *some* force to maintain control of the suspect. But one instance of that conduct—where the deputy's control of the suspect is not in jeopardy—does not make a blow to the back of the head in response clearly lawful to an objectively reasonable deputy. *See Baltimore*, 183 F. App'x at 898; *Smith v. Mattox*, 127 F.3d 1416, 1420 (11th Cir. 1997) (finding a blow that broke "a previously fractious" suspect's arm was excessive where arrestee had ceased all resistance); *cf. Mercado v. City of Orlando*, 407 F.3d 1152, 1157 (11th Cir. 2005) (finding pellets fired at the head excessive when suicidal subject did not comply with an order to drop his knife within fifteen seconds). A reasonable jury could find Deputy Harrell used excessive force based on Chambliss's version of events viewed in the light most favorable to him. Accordingly, there is a genuine issue of material fact precluding summary judgment on whether a constitutional violation occurred.

Considering the version of events before the Court, Chambliss's right was also clearly established. In the Eleventh Circuit, a right can be clearly established in one of three ways. *Crocker*, 995 F.3d at 1240. Plaintiffs must point to either (1) "case law with indistinguishable facts" at the time of arrest, (2) "a broad statement of principle within the Constitution, statute, or case law," or (3) "conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law." *Id.* (quoting *Lewis v. City of West Palm Beach*, 561 F.3d 1288, 1291–92 (11th Cir. 2009)). As to the first method, only decisions of the United States

Supreme Court, the Eleventh Circuit, or the highest court in a state can "clearly establish" the law. *Id.* However, the case law does not need to be "materially similar" to the deputy's conduct—rather, it need only provide the law enforcement officer with "fair warning." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). Even so, the Supreme Court has warned not to "define clearly established law at a high level of generality." *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014) (internal quotation marks omitted).

Chambliss has established, by his account, that he was a nonviolent suspect of a minor crime who was not resisting arrest. As of March 2019, more than a decade's worth of Eleventh Circuit precedent had clearly established that using substantial force against a nonviolent suspect, accused of only a minor crime and who is not actively resisting arrest, violates the constitution. *Fils*, 647 F.3d at 1292; *Hadley*, 526 F.3d at 1330; *Vinyard*, 311 F.3d at 1348; *Priester v. City of Riviera Beach*, 208 F.3d 919 (11th Cir. 2000); *Smith*, 127 F.3d at 1420; *see also Johnson*, 725 F. App'x at 876; *Baltimore*, 183 F. App'x at 898. This can include instances of substantial force used against a suspect who previously resisted without violence but had unequivocally stopped doing so. *See Smith*, 127 F.3d at 1420; *cf. Mercado*, 407 F.3d at 1157. Deputy Harrell said himself that he "would never strike a suspect that is not being violent." (Doc. 47, 20:17–18). From this precedent, he would have fair warning that striking the head of a nonviolent suspect of marijuana possession—who never left his control and was not resisting—right after dropping him to the ground would constitute excessive force.

Alas, this is not to say that Deputy Harrell will ultimately be denied qualified immunity at a later stage. *See Smith*, 127 F.3d at 1420. Active resistance like the kind Deputy Harrell described in his deposition would undoubtedly change the Court's calculus. If a jury, for example through special interrogatories, indicates that it believes Deputy Harrell's testimony that Chambliss actively resisted, it will be appropriate for the Court to revisit the issue of qualified immunity. *Id.* Ultimately, however, this case must go to a jury—since the Court may not evaluate the credibility of evidence on summary judgment. *Johnson v. Breeden*, 280 F.3d 1308, 1317 (11th Cir. 2002) (holding if there are facts inconsistent with granting qualified immunity at summary judgment, then "the case and the qualified immunity issue along with it will proceed to trial"). Defendants' Motion as to Count I is therefore denied.

### B.  Counts III & IV - *Monell* Claims

When the defendant is a local government entity or municipality, the plaintiff can establish § 1983 liability by showing that the defendant acted "pursuant to [an] official municipal policy of some nature." *Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658, 691 (1978). Municipal policy can come in different forms. The most commonly found example is the enforcement of an officially endorsed policy such as an ordinance, rule, regulation, code, or policymaker decision. *See, e.g., id.* at 694–95; *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988) (plurality opinion). But less-than-formal policies and practices may also subject a municipality to liability when they are so well-settled,

permanent, pervasive, and wide-spread that they "take[] on the force of the law." *McDowell v. Brown*, 392 F.3d 1283, 1290 (11th Cir. 2004) (internal quotation marks omitted).

For example, "a municipality's failure to correct the constitutionally offensive actions of its employees can rise to the level of a custom or policy 'if the municipality tacitly authorizes these actions or displays deliberate indifference' towards the misconduct." *Griffin v. City of Opa-Locka*, 261 F.3d 1295, 1308 (11th Cir. 2001) (quoting *Brooks v. Scheib*, 813 F.2d 1191, 1193 (11th Cir. 1987)). Additionally, "a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy[.]" *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (noting a municipality's culpability "is at its most tenuous where a claim turns on a failure to train").

Ultimately, a municipality will only be held responsible "for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality." *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 403–04 (1997). A municipality does not incur § 1983 liability for injuries caused solely by its employees. *Monell*, 436 U.S. at 694. A municipality will further not be liable under § 1983 for random acts, isolated incidents, or customs or practices of which its policymakers were unaware. *Depew v. City of St. Marys*, 787 F.2d 1496, 1499 (11th Cir. 1986). Therefore, although a custom need not receive formal approval, the

plaintiff must show actual or constructive knowledge of the custom by a policymaking body. *Id.*

Sheriff Ivey, as the duly elected leader of the Brevard County Sheriff's Office ("**BCSO**"), is a county officer who may be sued in his official capacity under § 1983 for municipal liability. *See Ortega v. Schramm*, 922 F.2d 684, 694 (11th Cir. 1991) (citing *Hufford v. Rodgers*, 912 F.2d 1338, 1342 (11th Cir. 1990)). Chambliss brings two *Monell* claims against him in his official capacity alleging a failure to train deputies (Count III) and ratification of Deputy Harrell's unconstitutional conduct (Count IV). But he does not provide evidence that a policy of excessive force against arrestees permeates BCSO—let alone that Sheriff Ivey knew about it. (Doc. 60, pp. 14–15).

First, Chambliss provides no evidence that any BCSO employee used excessive force to make an arrest other than Deputy Harrell.[11] "A pattern of similar constitutional violations by untrained employees is ordinarily necessary" to prove a failure to train claim. *Connick*, 563 U.S. at 62 (internal quotation omitted). A municipality can be liable for a single incident only where "the need for more or different training is so obvious, and the inadequacy [in training is] so likely to result in the violation of constitutional rights, that the policymakers . . . can reasonably be said to have been deliberately indifferent." *City of Canton v. Harris*,

---

[11]   In his response to Defendants' Motion, Chambliss references allegations made in the Amended Complaint in support of his claim. (Doc. 60, p. 14). But a party resisting summary judgment must "go beyond the pleadings" and provide some evidentiary support to meet their burden. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

489 U.S. 378, 390 (1989). Municipal liability cannot derive from an "isolated incident[]" and without evidence of other incidents of excessive force, Chambliss cannot prove the incident at hand is anything other than isolated. *See Depew*, 787 F.2d at 1499; *Holloway v. City of Orlando*, No. 15-CV-129-ORL-40-GJK, 2016 WL 4369958, at *7 (M.D. Fla. Aug. 16, 2016). Chambliss references Deputy Harrell's testimony that BCSO teaches deputies to use one level of force greater than the type of resistance a deputy is confronting. (Doc. 47, 27:14–21). But he provides no basis to believe that this policy, as recalled by Deputy Harrell, would obviously produce unconstitutional excessive force against arrestees.

Second, no reasonable jury could find from the record that Deputy Harrell has a pattern of using excessive force in making arrests to which BCSO turned a blind eye. In cases involving multiple misbehaving employees, the Eleventh Circuit has required evidence of a substantial number of constitutional violations that policymakers ignored to find a municipality ratified the conduct. *Compare Griffin*, 261 F.3d at 1308–09 (affirming liability when wide-spread sexual harassment permeated city hall that policymakers ignored and tolerated), *with Brooks*, 813 F.2d at 1193 (denying liability where city investigated all other police misconduct complaints and found them to lack merit). Assuming a single municipal employee's actions could form the basis of a ratification claim, a plaintiff would still need to prove an employee like Deputy Harrell committed a substantial number of constitutional violations of the kind this case concerns, which policymakers knew

or should have known about and ignored. *See Brooks*, 813 F.2d at 1193.

But Chambliss produces no evidence that Deputy Harrell has used excessive force other than during his arrest. Further, BCSO investigated the complaint of excessive force internally and, crediting Deputy Harrell's testimony, found it unsubstantiated. (Doc. 46, pp. 274–291). Chambliss references two previous BCSO policy violations in Deputy Harrell's personnel file—where he received discipline first for using his department-issued rifle to shoot at an alligator that he thought was attacking his personal dog, and second for tossing marijuana (recovered during a traffic stop of teens) into a gas station trash can rather than taking it in for destruction—but those infractions are entirely irrelevant to unconstitutional excessive force. (Doc. 47, pp. 22–25). A single constitutional violation of the kind described in this case committed by a single employee, which the sheriff's office investigated internally and found unsubstantiated, cannot suffice to establish municipal liability. *See Brooks*, 813 F.2d at 1193; *Depew*, 787 F.2d at 1499. Defendants' Motion will be granted as to Counts III & IV.

### C.    State-law Claims

Having disposed of the only federal claims against Sheriff Ivey, the Court declines to exercise supplemental jurisdiction over the state-law claims involving him. *See* 28 U.S.C. § 1367(c)(3) (district court may decline to exercise supplemental jurisdiction when claims giving rise to original jurisdiction have been dismissed). Accordingly, Chambliss's negligent retention claim (Count V) and

Sheriff Ivey's counterclaim will be dismissed without prejudice.

Thus, the Court is only left with the battery claim against Deputy Harrell. Deputy Harrell argues that he is entitled to summary judgment because Florida's sovereign immunity statute shields sheriff's deputies from personal liability in tort for injuries or damages they cause while acting within the scope of their employment. *See* FLA. STAT. § 768.28(9)(a). Like qualified immunity under federal law, when individual immunity under § 768.28(9)(a) attaches, the deputy is protected not just from liability, but from being sued for state tort claims. *Furtado v. Yun Chung Law*, 51 So. 3d 1269, 1277 (Fla. 4th DCA 2011). But this immunity from suit will not attach and a deputy may face personal liability for injuries and damages he causes where he "act[s] in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property." FLA. STAT. § 768.28(9)(a). Florida's Fifth District Court of Appeal explained "wanton and willful" conduct in the following way:

> Willful and wanton conduct is generally something more than ordinary negligence but less than deliberate conduct. Most definitions of willful or wanton conduct require that it appear that the defendant had knowledge of existing conditions, was conscious from such knowledge that injury would likely or probably result from his conduct, and with reckless indifference to the consequences consciously and intentionally does some wrongful act or omits to discharge some duty which produces the injurious result.

*Lemay v. Kondrk*, 923 So. 2d 1188, 1192 (Fla. 5th DCA 2006) (citation omitted).

Here, a reasonable jury could find that Deputy Harrell delivered the blow to the back of Chambliss's head with willful and wanton disregard for his rights.

Record evidence does not rule out Chambliss's version of events, in which he only wiggled during what, to him, was a consent search and then got struck across the back of his head immediately after Deputy Harrell dropped him to the ground. Deputy Harrell said that he would not strike a nonviolent suspect (Doc. 47, p. 20:17–18), from which a jury could infer, based on Chambliss's version, that the deputy was conscious that striking him would result in injury to his rights. Deputy Harrell therefore cannot establish that he must be afforded statutory immunity on summary judgment.

## IV.  CONCLUSION

For the aforementioned reasons, it is **ORDERED AND ADJUDGED** that Defendants' Motion for Summary Judgment (Doc. 59) is **GRANTED IN PART** and **DENIED IN PART** as follows:

1.   Summary judgment is **GRANTED** as to Counts III & IV.

2.   Summary judgment is **DENIED** as to Counts I & II.

3.   Count V and Sheriff Ivey's counterclaim for incarceration costs (Doc. 22, pp. 10–11) are **DISMISSED WITHOUT PREJUDICE**.

**DONE AND ORDERED** in Orlando, Florida on August 17, 2023.

PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties